**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**LAWRENCE JORDAN,**<br><br>Defendant. | **Case No.: 25-CR-110 (RDM)** |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

This case marks the third time the defendant, Lawrence Jordan, will be sentenced for possessing a firearm in violation of 18 U.S.C. § 922(g)(1). Since his first felon-in-possession conviction in 2005, Mr. Jordan has spent very little time in the community. When released into the community, Mr. Jordan reoffends in short order. He has been completely undeterred by numerous prior periods of court-ordered supervision, probation, incarceration, or thirty-five previous arrests. The only time Mr. Jordan has not put the community at risk is when has been incarcerated. For the following reasons, the Government respectfully requests that the Court impose a sentence of 27 months' imprisonment followed by three years of supervised release.

**BACKGROUND**

*The Offense*

On November 23, 2023 at 6:16 a.m., Metropolitan Police Department Officers Don Marshall and Keven Douglass responded to Tony's Breakfast at 1387 H Street NE for a report of aggressive panhandling. Officer Marshall recognized Mr. Jordan as wanted in connection with an indecent exposure offense a week earlier. Mr. Jordan was placed under arrest for Lewd, Indecent, and Obscene Acts. He was searched and transported to the First District for Processing.

1

At the First District, the defendant was searched more thoroughly. He was wearing a bulky knee brace at the time he was arrested. At the station, he was searched by Officer John Briscoe, who located a firearm underneath the knee brace. Specifically, Officer Briscoe located a Smith & Wesson 9mm semi-automatic firearm, loaded with one round in the chamber and eight rounds in the magazine.



## **ARGUMENT**

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will

ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."

*Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>>> (i) issued by the Sentencing Commission . . .; and
>>> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
>> (A) issued by the Sentencing Commission . . . and
>> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies

3

broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE APPLICABLE SENTENCING GUIDELINES

The PSR estimates Mr. Jordan's offense level to be 13 and his criminal history to be Category IV, yielding a Guidelines imprisonment range of 24 to 30 months' imprisonment. PSR at ¶ 129. Additionally, the PSR reflects a Guidelines range for a term of 1 to 3 years of supervised release on Count 1. *Id.* at ¶ 135.

The Government concurs with these calculations. The defense has maintained one of the scored convictions—a 2009 Maryland state conviction for 2nd Degree Assault, Fleeing, and Driving while Revoked—should not be scored. Specifically, Mr. Jordan maintains that he was not convicted in that matter.

The PSR indicates that Mr. Jordan was convicted in Prince George's County Circuit Court Case CT071879X of Assault 2nd Degree, Fleeing, and Driving while revoked. PSR ¶ 38. According to the PSR, Mr. Jordan was sentenced to 18 months imprisonment on the Assault 2nd Degree count

on June 24, 2009. *Id*. The PSR suggests that this prior conviction was included in the PSR from Mr. Jordan's 2010 Felon-in-Possession conviction in the Eastern District of Virginia. *Id*. Additionally, the Government requested records from the State of Maryland, which also indicate that Mr. Jordan was sentenced to 18 months imprisonment. *See* Ex. 1. Other than Mr. Jordan's unsupported representation, there is no evidence that Mr. Jordan was not sentenced to 18 months imprisonment in the case from Prince George's County. "[C]riminal history points are based on the sentence pronounced, not the length of time actually served." U.S.S.G. § 4A1.2, Cmt. 2. Given that the sentence imposed exceeded one year and one month and occurred within fifteen years of the instant offense, the sentence should be scored as 3 points. *See Id*. § 4A1.1(a). Mr. Jordan is properly in Criminal History Category IV.

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Mr. Jordan to 27 months' imprisonment, followed by three years of supervised release. This sentence—the middle of the applicable guidelines range—reflects the serious nature of this offense, Mr. Jordan's criminal history, and provides adequate deterrence to others in the community, particularly given the danger presented by the carrying of loaded firearms.

### A.     The Nature and Circumstances of Mr. Jordan's Offense.

Mr. Jordan pled guilty to carrying a loaded firearm located on his person. That alone is incredibly dangerous. *See United States v. Blackson*, 2023 WL 1778194, at *7 (D.D.C. Feb. 6, 2023) ("Illegally possessing a fully loaded concealed firearm with easy, quick access in the front waistband of defendant's pants, while out in public, poses an inherent risk of danger to the community."). And Congress recently indicated how seriously these offenses should be taken when it increased maximum sentences for 18 U.S.C. 922(g) from 10 years to 15 years.

5

Here, however, the Court should also consider the circumstances of Mr. Jordan's arrest. On November 16, 2023, MPD Officers Marshall and Topaz Proctor were called to the Station House Apartments at 702 2nd St SE for a disorderly conduct. Inside the apartment, an individual who identified himself as "Mitch Harris," but who would be identified a week later as Mr. Jordan, was sleeping on the floor in the resident lounge. They escorted Mr. Jordan out of the apartments. The officers remained in the Station House Apartments for a brief period before returning to their cars.

As they returned to their cars, the officers were approached by W-1, who worked at Barre 3—a workout facility in the same building as the Station House Apartments. She indicated that there was an unwanted individual in Barre 3. The officers walked inside and saw that it was Mr. Jordan, who they escorted out. Officers Proctor and Marshall observed Mr. Jordan leave the block, eventually leaving their line of sight. Officer Proctor noted the following description for the individual later identified as Mr. Jordan: black male, dreadlocks, missing front teeth, tattoo of a hairline on his forehead, and dressed in all black clothing.

About 40 minutes later, Officer Proctor and Officer Michael Lee were dispatched to Barre 3. Ex. 2. Two employees from Barre 3, including W-1, reported that Mr. Jordan had returned to the window outside the fitness center and was pleasuring himself while watching a workout class in session. Ex. 3. Among the members of the class was a United States Senator, who also reported the incident to MPD. Ex. 2. Mr. Jordan was gone by the time police arrived, but the employees reported that it was the same individual as earlier. They described Mr. Jordan as tall, wearing all black, having dreadlocks, missing a tooth, and having a hairline tattoo. Ex. 3.



On November 23, 2023, both Officers Marshall and Proctor were called to Tony's Breakfast. They each recognized Mr. Jordan as the individual they had removed from Barre 3 and the Station House Apartments a week earlier. He also had dreadlocks, a missing a tooth, and a hairline tattoo. Mr. Jordan was wearing a large brace on his right leg. Surveillance footage shows that the individual that officers interacted with at Station House Apartments and that exposed himself in front of Barre 3 walked with a significant limp in his right leg. Ex. 4. Moreover, on November 9, 2023—one week before the incident at Barre 3—Officer Proctor was called to Station House Apartments to remove a non-resident from the gym. The individual—who Officer Proctor later recognized as the same individual from the November 16th incident and the November 23 arrest—also claimed his name was "Mitch Harris." Body-worn camera footage shows that the arm/wrist tattoos of the individual who identified himself as "Mitch Harris" on November 9, 2023 are identical to the arm/wrist tattoos of Mr. Jordan as captured on the date of his arrest.





"Mitch Harris" at the Station House
Apartments on 11/9/23

Lawrence Jordan at time of his
arrest 11/23/23

In light of all this, the Court can confidently conclude that in addition to Mr. Jordan carrying a

loaded firearm on his person, he pleasured himself in broad daylight while leering at a group of

women in a workout class.[1] This is particularly concerning given Mr. Jordan's history and

characteristics.

> **B.    The History and Characteristics of the Defendant.**

Mr. Jordan has a long history, which includes thirty-five arrests, convictions for violent

crimes, two prior convictions for felon-in-possession, and repeated failures under supervision.

Mr. Jordan's first conviction under 18 U.S.C. § 922(g) was in this court in case number 04-

CR-40. He was sentenced by Judge Sullivan to 37 months incarceration followed by three years

supervised release. Less than a year into his supervised release, on December 20, 2006, Judge

Sullivan revoked his supervised release and resentenced Mr. Jordan to an additional 90 days.

---

[1] The United States had no role in the prosecution or ultimate decision to dismiss the Lewd, Indecent, and Obscene
Acts charges against Mr. Jordan. That case was prosecuted by Office of the Attorney General for the District of
Columbia.

Less than six months later, Mr. Jordan was arrested for Second Degree Assault in Prince Georges County, Maryland. Mr. Jordan was convicted of that charge and sentenced to 18 months imprisonment on June 24, 2009.

On December 16, 2008, Mr. Jordan was charged in the Eastern District of Virginia with yet another violation of 18 U.S.C. § 922(g). He was sentenced to 8 years incarceration in that case, followed by three years of supervised release.

Mr. Jordan was released from prison and began his term of supervised release on June 23, 2017. Less than two months later and still while on supervised release, Mr. Jordan was arrested in 2017-CF1-013534. In that case, Mr. Jordan was convicted of Third-Degree Sex Abuse after a guilty plea. As described in the PSR, Mr. Jordan followed the victim into her apartment and told her that he wanted to take a shower with her. PSR ¶ 42.  When the victim refused, a struggle ensued, and Mr. Jordan and the victim fell onto a living room table. *Id*.  Mr. Jordan then placed his forearm around the victim's neck and dragged her into the bedroom. *Id*. The victim was able to flee her apartment. For these actions, Mr. Jordan was sentenced to two years incarceration followed by five years of supervised release. Additionally, Mr. Jordan's supervision in the Eastern District of Virginia was revoked, and he was resentenced to 18 months incarceration.

When he was released from that term of incarceration, Mr. Jordan began supervised release on the D.C. Superior Court case. In short order, Mr. Jordan again failed on supervised release and was revoked on August 12, 2022. He was released from custody on October 3, 2023—less than two months from when he was arrested for lewd acts and found to be in possession of a firearm.

This factor favors a significant prison sentence. Mr. Jordan's history is incredibly consistent. Within months of being in the community, Mr. Jordan reoffends and poses a danger to those around him.

**C.      Unwarranted Sentencing Disparities**

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

According to the U.S. Sentencing Commission's Judiciary Sentencing Information, during the last five years "there were 385 defendants whose primary guideline was §2K2.1, with a Final Offense Level of 13 and a Criminal History Category of IV, after excluding defendants who received a §5K1.1 substantial assistance departure." PSR ¶ 152. Ninety-six percent of those defendants received a term of imprisonment. *Id*. "For the 369 defendants (96%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 25 month(s) and the median length of imprisonment imposed was 24 months." *Id*.

Here, the Government's request is slightly above the median and mean. This is warranted

considering the facts surrounding Mr. Jordan's arrest and the fact that this is his third violation of 18 U.S.C. § 922(g)(1).

**D.**     **The Need for the Sentence Imposed.**

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. Despite his many felony convictions, Mr. Jordan continues to illegally possess firearms and put the community at risk. Prior periods of incarceration and periods of supervision have done little to deter him. The requested sentence provides specific deterrence: it will keep our community safe from Mr. Jordan for a period of time. It provides general deterrence: it will signal to the community that the possession of illegal firearms is a serious matter and hopefully deter others from doing so. The requested sentence of 27 months' incarceration is a reasonable one.

## CONCLUSION

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 27 months of incarceration followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:     */s/ Joshua Gold*
Joshua Gold
Tx Bar No. 24103101
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-815-8965
Joshua.Gold@usdoj.gov